**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

---

**SHELLEY A. TERLECKI,**

        **Plaintiff,**

        **v.**                              **Case No. 10-C-478**

**MICHAEL J. ASTRUE,**

        **Defendant.**

---

**DECISION AND ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER**

---

**I. HISTORY**

In September 2003, Shelley A. Terlecki ("Terlecki") was struck in the eye with a drill bit. As a result, her eye was surgically removed. Terlecki contends that she is disabled due to this injury and a long list of other physical and mental problems: chronic pain in her back, neck, hips, legs, and wrists; degenerative disk disease; sciatica; restless leg syndrome; ankle swelling; De Quervain's tenosynovitis (also known as trigger finger syndrome); bursitis in both elbows; severe acid reflux; hiatal hernia; irritable bowel syndrome; chronic sinusitis; asthma; vertigo; severe premenstrual dysphoric disorder; seasonal allergies; major depression; anxiety disorder; and posttraumatic stress disorder. (Docket No. 10 at 1.) For these problems, Terlecki identifies 16 different medications she regularly takes including three different anti-depressant / anti-anxiety drugs, a narcotic pain medication, a muscle relaxer, four different medications for gastrointestinal problems, two asthma medications, a drug to treat motion sickness, and a drug commonly used to treat symptoms of Parkinson's disease. (Docket No. 10 at 2.)

This is the second time Terlecki's claim for Social Security disability benefits is before a federal court. See E.D. Wis. Case No. 07-CV-535. In her first case, after Terlecki received an unfavorable decision following a hearing before an ALJ, Terlecki, proceeding with the assistance of counsel, challenged that decision in federal court. In that case, the parties jointly sought to remand the case pursuant to sentence four of 42 U.S.C. § 405(g). (Case No. 07-CV-535, Docket No. 13.) The Honorable Rudolph T. Randa granted the parties' request and ordered the ALJ on remand to

> reevaluate the weight to be accorded the physician opinions of record, including Terlecki's treating psychiatrist, Dr. Bugarino, providing reasons, supported by the record, for the weight given to each opinion; (2) reevaluate the credibility of Terlecki's subjective complaints, including her alleged psychological symptoms, in accordance with the regulations, and to provide reasons, supported by citations in the evidence of record, for the credibility findings; (3) reevaluate Terlecki's residual functional capacity; (4) allow Terlecki to appear at a supplemental hearing and submit updated evidence; and (5) proceed through the sequential evaluation process as necessary to issue a new decision.

(Case No. 07-CV-535, Docket No. 14.)

Terlecki continued to be represented by counsel throughout the proceedings on remand, but she is now proceeding pro se in her challenge to the ALJ's second decision. This matter was randomly assigned to this court and all parties have consented to the full jurisdiction of a magistrate judge. (Docket Nos. 3, 6.) Terlecki's adult daughter has submitted an initial brief on Terlecki's behalf (which the court shall accept as if it was filed by the pro se plaintiff). (Docket No. 10). The Commissioner has responded, (Docket No. 11), and Terlecki, in a brief that indicates it was dictated by Terlecki but typed by her adult daughter, has replied, (Docket No. 15). The pleadings in this matter are closed and the matter is ready for resolution.

**II. STANDARD OF REVIEW: SUBSTANTIAL EVIDENCE**

In addressing the issues raised by the claimant, the court is limited to determining whether the ALJ's factual findings are supported by "substantial evidence." Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004). The court may not re-weigh evidence, resolve conflicts in the record,

decide questions of credibility, or substitute its own judgment for that of the Commissioner. Id.; Edwards v. Sullivan, 985 F.2d 334, 336 (7th Cir. 1993).

The substantial evidence burden is satisfied when the evidence is such that a reasonable mind might accept it as adequate to support a conclusion. Williams v. Apfel, 179 F.3d 1066, 1071 (7th Cir. 1999). Although a mere scintilla of proof will not suffice, Butera v. Apfel, 173 F.3d 1049, 1055 (7th Cir. 1999), substantial evidence may be something less than the greater weight or preponderance of the evidence, Young v. Sullivan, 957 F.2d 386, 388 (7th Cir. 1992). If the ALJ rejects uncontradicted evidence, reasoning for that rejection must be clearly articulated. Id.; Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). If the ALJ's decision rests on the credibility determination, this court will overturn that determination only if it is patently wrong. Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000). Special deference is appropriate because the ALJ is in the best position to see and hear the witness and to determine credibility. Id. at 435.

When the Commissioner denies social security benefits, the ALJ is required to "build an accurate and logical bridge from the evidence to [his] conclusions" so that a reviewing court may afford the claimant meaningful review of the SSA's "ultimate findings." Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003) (citing Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2002)); Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002). Further, the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review." Steele, 290 F.3d at 940. Finally, if the ALJ committed an error of law, this court may reverse the Commissioner's decision, regardless of whether it is supported by substantial evidence. Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989).

Simply stated, this court's role is not to look at all the evidence again and make an independent determination of whether the claimant is disabled. This court's role is very limited. If the ALJ complied with the rules and there is a good reason for his or her decision, even if it is a

3

decision that the claimant strongly disagrees with, the court will not undo that decision. Moreover, the question that is relevant to whether Terlecki is entitled to Social Security Disability Insurance ("SSDI") is not whether Terlecki is currently disabled, but rather, whether she was disabled when she was last insured, which in this case the Commissioner determined was on December 31, 2006. (Tr. 560.) Thus, evidence acquired after this date is relevant in the SSDI analysis only to the extent that it sheds light upon what her condition was prior to 2007. However, the standard for Supplemental Security Income ("SSI") is different. SSI may provide benefits to disabled individuals with limited income, regardless of whether the individual was disabled before the date last insured. See, e.g., 20 C.F.R. § 416.202.

### III. DETERMINING DISABILITY: A FIVE-STEP ANALYSIS

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether the claimant was disabled, the ALJ applied the following five step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairments equates to one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appx. 1 ("Appendix 1"); (4) whether the claimant is unable to perform past relevant work; and (5) whether the claimant is incapable of performing work in the national economy. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920; Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step, or on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled. Zurowski v. Halter, 245 F.3d 881, 885-86 (7th Cir. 2001) (citing Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)). The claimant bears the burden of proof in the first four steps. Young v. Secretary of Health & Human Servs., 957

F.2d 386, 389 (7th Cir. 1992). If the claimant sustains that burden, at Step 5, the burden shifts to the Commissioner. Id. The ALJ is required to carefully consider and explain in his or her decision the weight given to the opinions of state agency doctors and consultants. SSR 96-6p.

**IV. ANALYSIS**

Terlecki contends contrary to the ALJ's determination, her former primary care physician, Dr. Randal Vosters, never said that Terlecki was capable of light work. (Docket No. 10 at 3.) Terlecki further alleges that the ALJ afforded this opinion of Dr. Vosters and of consulting physicians significant weight, while allegedly ignoring the opinion of Terlecki's new primary care physician, Dr. David Stolp, as well as "six or more doctors all of whom are specialists in one or more of the fields regarding her conditions" who found her disabled. (Docket No. 10 at 3.) Terlecki further contends that the ALJ failed to properly consider her mental health impairments. (Docket No. 10 at 4.) Finally, in passing, Terlecki raises an argument that the ALJ's conclusion that Terlecki could perform light work failed to consider limitations on the use of her hands. (Docket No. 10 at 5.)

The Commissioner responds that Terlecki's current arguments relate primarily to the ALJ's first decision. (Docket No. 11 at 1-2, 11.) These alleged errors were corrected on remand and thus, in her second opinion, the ALJ appropriately considered the opinions of other doctors, including Dr. Stolp, and considered Terlecki's mental health problems. (Docket No. 11 at 2.)

The Commissioner notes that Dr. Vosters completed a "Medical Examination & Capacity Form" on October 21, 2003 wherein he stated that Terlecki could occasionally lift a maximum of twenty pounds and that she could occasionally lift a maximum of ten pounds and had no limitations in terms of standing and walking or in her ability to sit for any length of time. (Tr. 129-30.) Under the Administration's regulations, these abilities add up to an ability to do light work. See 20 C.F.R. §§ 404.1567(b), 416.967(b). Although Dr. Vosters noted that Terlecki was limited in her ability to

use her hands, he noted that this would be remedied with rehabilitation. (Tr. 130.) (However, the court notes, because the evaluation deals with Terlecki's adjustment to the loss of her eye, it appears that when asked on the form for whether Terlecki had any limitations on the use of her hands, Dr. Vosters' answer is not in reference to any musculoskeletal limitation but merely that before using her hands extensively in an occupational setting Terlecki will require rehabilitation to adjust to the loss of depth perception.) Therefore, Dr. Vosters stated that Terlecki would be eligible to return to work, with certain medical restrictions, on February 1, 2004. (Tr. 130.) Although Dr. Vosters concluded that Terlecki was unable to work on October 21, 2003, he believed that her inability to work would not last the requisite 12 months. Finally, the Commissioner contends that the ALJ did properly include Terlecki's limitations regarding her hands in the hypotheticals she presented to the vocational expert ("VE"). (Tr. 901.) The VE identified numerous light and sedentary jobs that would account for her limitations. (Tr. 902.)

### A. Consideration of Treating Source Opinions

Terlecki begins that the ALJ failed to afford proper weight to the opinion of Dr. Stolp. (Docket No. 10 at 3.) Dr. Stolp was Terlecki's primary care physician since 2004, (Tr. 563), and therefore his medical opinions may be entitled to controlling weight. See 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. A treating source's opinion about the nature and severity of the claimant's impairments will be afforded controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). Even if a treating source's opinion is entitled to controlling weight, this does not mean that the Commissioner must agree if a doctor says that his patient is disabled. Whether or not a person is disabled is a determination that is reserved for the Commissioner, and therefore although it cannot simply be ignored, even a treating source's

opinion that his patient his disabled is not entitled to controlling weight or even any special significance. 20 C.F.R. § 404.1527(e)(1); SSR 96-5p.

The ALJ concluded that Dr. Stolp's characterization that Terlecki is incapacitated was not supported by medical findings. (Tr. 564.) Initially, Dr. Stolp concluded that Terlecki's limitations could be expected to cease shortly. Dr. Stolp opined on August 4, 2006 she would be unable to work until December 6, 2004 because of depression and related mental health limitations. (Tr. 345-46.) In February of the following year, Dr. Stolp stated that Terlecki remained unable to work because of mental health issues and estimated that she would be able to return to work as of April 4, 2005. (Tr. 461-62.)

While Terlecki's first administrative review action was pending in federal court, Dr. Stolp prepared an additional assessment. In a questionnaire dated July 12, 2007, Dr. Stolp added low back pain as one of her diagnoses, and stated that Terlecki would be unable to do any work. (Tr. 751-60.) This time, Dr. Stolp did not include any estimate as to when these restrictions might cease. (Tr. 752.) The ALJ rejected the conclusion of Dr. Stolp, noting that it was not supported by recent clinical findings and was not consistent with recent MRI results. (Tr. 566.) Dr. Stolp similarly submitted a questionnaire dated April 29, 2009 wherein he offered estimates of Terlecki's abilities to sit, stand, lift, and carry. (See Tr. 566.) Again, the ALJ concluded that this assessment was unsupported by any objective evidence. (Tr. 566.)

The ALJ's rejection of Dr. Stolp's assessments was supported by substantial evidence and therefore cannot be upset by this court. Beginning in about 2002, Terlecki began complaining of back pain. (Tr. 157.) However, x-rays from this period did not detect any problems. (Tr. 179.) In 2003, Terlecki was diagnosed with a back strain and was able to return to work within 3 days. (Tr. 138.) Following a traffic accident in 2004, Terlecki suffered from whiplash and lower back pain for

which she was prescribed pain medication and then cleared to return to work. (Tr. 202.) X-rays in 2005 again did not detect any significant problems. (Tr. 438-39.)

Terlecki began seeing a chiropractor in March of 2005 for her back pain, (Tr. 392), but Terlecki reported that this treatment only aggravated her pain, and therefore in May of 2007 she began treatment at a pain management clinic, (Tr. 696). An MRI conducted at this time showed "[m]ild broad based disc bulge and loss of T2 signal intensity with preservation of disc height at L4/5." (Tr. 682.) A neurosurgeon on July 11, 2008 examined Terlecki and reviewed an MRI and concluded there was evidence of degenerative disc disease but no evidence of spinal cord compression or central canal stenosis. (Tr. 729-30.)

Although the more-recent MRI indicates an objective abnormality, this test and the accompanying treatment records do not support the nature and extent of the limitation found by Dr. Stolp. Simply because Dr. Stolp offered a conclusion regarding Terlecki's limitations does not mean that the ALJ was required to accept it. In this case, as the ALJ noted, Dr. Stolp's conclusion was not supported by objective medical evidence and was inconsistent with much of the medical evidence in the record, including Dr. Stolp's own treatment records. Therefore, the ALJ was permitted to not credit Dr. Stolp's conclusions.

In addition to rejecting Dr. Stolp's conclusions regarding Terlecki's physical limitations, the ALJ also rejected Dr. Stolp's conclusions regarding her non-physical limitations. As the ALJ noted, Dr. Stolp's conclusion's regarding Terlecki's mental health issues, (Tr. 345, 461), were not supported by objective clinical findings. (Tr. 561.) Although Dr. Stolp prescribed Terlecki anti-depressants, "he did not administer tests of intelligence, personality, and/or symptom validity," or cite any objective clinical findings for his conclusions. (Tr. 564.) Contrary to Dr. Stolp's conclusions, the mental health professionals treating Terlecki generally noted that her mental health condition was improving. (See, e.g., Tr. 297-302.)

On the other hand, Kathryn Kinter ("Kinter"), an intern working with Terlecki at Insight Counseling Services, (Tr. 394-422), provided a particularly dire portrait of Terlecki's mental health status, noting that she had "no useful ability to function" in 12 out of 16 "mental abilities and aptitudes needed to do unskilled work," including carry out simple instructions, working with others, accepting instructions, and being aware of hazards in order to take normal precautions. (Tr. 512.) With respect to the remaining 4 abilities and aptitudes, Kinter rated Terlecki as "limited but satisfactory;" for no criteria on the questionnaire did Terlecki earn a rating of "unlimited or very good." (Tr. 512.)

The ALJ did not credit Kinter's bleak characterization because it was not consistent with Kinter's treatment notes. (Tr. 565.) Having reviewed the treatment notes from Insight Counseling, (Tr. 395-422), the court finds that the ALJ's decision to not credit Kinter's answers on the pre-printed questionnaire was well-supported. Contrary to the assessment presented in the questionnaire, the treatment notes do not depict Terlecki's mental health problems as debilitating, and instead present Terlecki as capable of work. For example, Terlecki reports contemplating returning to school in order to improve her employment prospects. (Tr. 398.) The treatment notes generally focus on a variety of relationship problems, such as getting her son to attend school, Terlecki's infrequent use of crack cocaine, her fiancée's use of drugs and attempting to relocate her brother, who was living in the basement and also using drugs.

Terlecki also contends that the ALJ erred because she "has been found disabled and unable to work by six or more doctors all of whom are specialists in one or more of the fields regarding her conditions." (Docket No. 10 at 3.) This claim that 6 different professionals found her to be disabled appears to have been taken from the brief submitted by Terlecki's attorney the first time this matter was before a federal court. (Tr. 572-82). However, upon closer review, it is clear that six medical professionals did not conclude that Terlecki was disabled, as that term is used in the context of

9

Social Security. To the contrary, the professionals referred to in Terlecki's first brief generally indicated that Terlecki's inability to work was temporary and she could be expected to return to work within a few months. (Tr. 576-82; see also Tr. 130 (Dr. Voster's October 21, 2003 assessment that Terlecki could return to work February 1, 2004); Tr. 231 (Dr. Jonathan Hershey's statement that a return to work date will have to be determined following surgery by Dr. Bruce Massaro); Tr. 263 (Dr. Massaro's statement Terlecki will be able to return to work 14 days after eye surgery)).

### B. Consideration of Non-Physical Limitations

As noted above, Kinter, and to a lesser extent Dr. Stolp, concluded that Terlecki's depression, anxiety, and post-traumatic stress precluded her from working. Dr. B. Marc O'Brien, on May 17, 2007, a psychologist asked to evaluate Terlecki's employment prospects as part of Wisconsin's W2 program, similarly opined that Terlecki's "has a severe emotional pathology and this pathology significantly interferes with her functioning, making successful employment unlikely." (Tr. 831.) Dr. O'Brien's conclusion was based upon a single consultation; as such, this opinion is not entitled to the weight that would be afforded a treating professional.

The ALJ discounted Dr. O'Brien's conclusion because it was based upon a single consultative examination and was inconsistent with other medical evidence in the record, specifically the records of Dr. Joseph Burgarino. (Tr. 567.) In fact, aspects of Dr. O'Brien's own report, like the treatment records of Kinter and Dr. Stolp, tend not to support his ultimate conclusion. Dr. O'Brien found that Terlecki's intellectual functioning was generally within the average range, that her attention was good, and her concentration adequate. (Tr. 827.) Because of her intellectual abilities and above functional academic skills, Dr. O'Brien believed rehabilitation was possible. (Tr. 830.)

Terlecki's psychological records portray an individual suffering from depression and later anxiety but whose condition was generally improving. Dr. Burgario stated on January 21, 2004 that

although she was presently unable to work, she could be expected to return to work in August of 2004. (Tr. 294.) According to the treatment notes, Terlecki's GAF quickly improved from 55 when she began treatment, (Tr. 286-87), to the 60s where it remained for the roughly 6 months Terlecki pursued treatment, (Tr. 296-97, 300-03). Despite this improvement with treatment, records indicate that Terlecki had difficulty committing to treatment. Terlecki repeatedly missed appointments, failed to return telephone calls, (Tr. 367), and lacked motivation to pursue occupational therapy to adjust to the loss of her eye, (Tr. 301).

Terlecki's anxiety was exacerbated by an incident in August of 2005 in which her thirteen-year-old son went to Arizona to meet a man he met on the internet. Her son returned home within a week but the effects of the event continued with the criminal prosecution of the adult and his threats against Terlecki's son and family. (Tr. 537-38; Docket No. 15 at 1.) However, as the ALJ noted, Terlecki's psychological record is quiet from May of 2006 until May 17, 2007. (Tr. 567.) In 2008, according to largely illegible progress notes, Terlecki was diagnosed with post-traumatic stress disorder. Notwithstanding, the medical records prior to this do not appear to contain any substantial discussion of Terlecki's problems with anxiety.

The ALJ's conclusion that Terlecki's mental health impairments did not meet or medically equal a listed impairment (the ALJ considered Listing 12.04 and 12.06), (Tr. 568), is well-supported by the evidence. Under both Listing 12.04 and 12.06, a claimant may be found disabled if her anxiety or depression leads to 2 of the following characteristics:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

20 C.F.R. § 404 Appendix 1, Listing 12.04.

Although there was some evidence that Terlecki's depression and to a lesser extent anxiety led to difficulties in the activities of daily living, maintaining social functioning, and maintaining

11

concentration, persistence, or pace, the ALJ concluded that these difficulties were not "marked." There was no evidence of repeated episodes of deompensation. The ALJ observed that Terlecki is able to tend to her personal hygiene, manage the family's finances including survivor benefits for her daughter, relate well to the public when necessary and medical professionals who reported she was pleasant, well orientated, and cooperative. (Tr. 568.) Having reviewed the record, the court finds these conclusions supported by substantial evidence.

Finally, the medical evidence does not demonstrate the existence of a:

Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

>    1. Repeated episodes of decompensation, each of extended duration; or
>
>    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
>    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § 404 Appendix 1, Listing 12.04.

Similarly, there is no evidence that Terlecki has a "complete inability to function independently outside the area of one's home." 20 C.F.R. § 404 Appendix 1, Listing 12.06. Therefore, the ALJ's conclusion that Terlecki's mental impairments did not meet or medically equal a Listing is well supported by the evidence. Having closely reviewed the ALJ's decision, the governing regulations and Social Security Rules, and the record in this matter, it is the conclusion of this court that the ALJ appropriately considered Terlecki's non-physical impairments.

### C. Consideration of Limited Use of Hands and Wrists

In a July 12, 2007 assessment, Dr. Stolp opined that Terlecki was effectively precluded from grasping, turning, or twisting objects. (Tr. 756.) This assessment pertains to a time period beyond

the last insured date for SSDI; it is only relevant to an SSI determination, but there is no objective medical evidence to support this conclusion. In fact, there does not appear to be any discussion in the record of Terlecki suffering from any sustained limitation on the use of her hands. As discussed above, Dr. Voster indicated in October 21, 2003 that Terleck's ability to use her hands was limited "until rehabbed," (Tr. 130), but this appears to be a reference to Terlecki's difficulties adjusting to the loss of her eye. The evidence that comes closest to suggesting a musculoskeletal or neurological problem with Terlecki's hands are records wherein she reports suffering pain in her forearm after wrestling with her son in August of 2006. (Tr. 440, 48.) X-rays did not reveal any problem. (Tr. 448.) Other medical records, such as a May 4, 2007 initial evaluation at a pain management clinic, (Tr. 694), and a follow-up visit about a year later, (Tr. 736), each state that both hands are normal.

Thus, in the absence of evidence to indicate that Terlecki was unable to use her hands, the ALJ could have entirely rejected this alleged limitation. Instead, the ALJ presented a hypothetical to the vocational expert asking the VE to consider a person who would be limited to using her hands on a frequent but not constant basis. (Tr. 901.) The ALJ opined that considering this and other limitations, the individual could perform various light and sedentary jobs. (Tr. 902.)

The ALJ's conclusion that Terlecki was capable of frequent but not constant use of her hands is supported by substantial evidence. Moreover, considering all the evidence in the record, the ALJ's conclusion that Terlecki retained the residual functional capacity for unskilled, routine, low-stress, light work is supported by substantial evidence.

**V. CONCLUSION**

Having considered the arguments presented in Terlecki's briefs, the court concludes that the ALJ's decision was consistent with the governing law and was supported by substantial evidence. Therefore, the court must affirm the decision of the Commissioner. Although various medical providers stated on questionnaires that Terlecki has severe limitations precluding her from all work,

these conclusions were generally inconsistent with the treatments records and were not supported by objective medical testing. Even though there is some suggestion that Terlecki's condition has deteriorated recently, there is a general dearth of supporting evidence, particularly in the form of objective medical testing, and thus, the ALJ's conclusion that based upon the totality of the record Terlecki remains capable of working is supported by substantial evidence.

**IT IS THEREFORE ORDERED** that the decision of the Commissioner is **affirmed**. The Clerk shall enter judgment dismissing plaintiff's complaint and this action.

Dated at Milwaukee, Wisconsin this 20th day of December, 2010.

s/AARON E. GOODSTEIN
U.S. Magistrate Judge